1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LILLIAN PELLEGRINI,** | **1:16-cv-01292 LJO BAM** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER GRANTING DEFEDANTS' MOTIONS TO DISMISS (Docs. 40, 42, 43, 44, 45, 46)** |
| **v.** | |
| **FRESNO COUNTY,** *et al.,* | |
| **Defendants.** | **MEMORANDUM DECISION AND ORDER DENYING BEVERLY PELLEGRINI'S REQUEST FOR INTERVENTION (Doc. 15)** |

## I. <u>INTRODUCTION</u>

Pending before the Court are six motions to dismiss the complaint filed by Defendants Fresno County Superior Court ("FCSC") (Docs. 40, 42); Fresno County (erroneously sued as Fresno County Counsel representing Joshua Cochron and Fresno County Public Guardian (Doc. 43); UBS Financial Services ("UBS") and The Bank of New York Mellon ("BNY") (Doc. 44);   Weintraub Genshlea Chediak Tobin & Tobin (erroneously sued as and herein referred to as "Weintraub Tobin") (Doc. 45); and Comerica, Inc. ("Comerica") (Doc. 46).  Also pending is Beverly Pellegrini's ("Beverly") request to intervene.  (Doc. 15.)

Having reviewed the parties' briefs and all supporting documents, the Court found these motions suitable for decision without oral argument, and the hearing set for April 10, 2017, was vacated.  For the reasons set forth below, Defendants' motions to dismiss are GRANTED, and Beverly Pellegrini's motion for intervention is DENIED.

1

1

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

2      This case stems from a trust administration dispute between Lillian Pellegrini ("Lillian") and her

3 daughter, Marleen Merchant ("Marleen"), which was decided in a probate proceeding conducted by the

4 FCSC, Case No. 10CEPR00683.  Lillian appealed the FCSC judgment, and the Fifth District Court of

5 Appeal (the "Fifth DCA") affirmed the FCSC judgment on October 31, 2016.  Lillian filed a petition

6 for review in the California Supreme Court, which was summarily denied on January 11, 2017.  The

7 FCSC judgment is now final.

8 **A.     The 1999 Trust**

9      Angelo John Pellegrini (Angelo) and Lillian, as husband and wife, executed what the Fifth DCA

10 termed a "fairly standard revocable living trust" on June 18, 1999.  As described by the Fifth DCA,

11
12
> [t]he Trust states that Angelo and Lillian (also referred to as the trustors) have two children – namely, their daughters Beverly Jean Pellegrini (Beverly) and Marleen – who would receive the remainder of the Trust estate in equal shares after Angelo and Lillian died.  Angelo and Lillian, during their joint lifetimes, were the co-trustees of the Trust.

13

14
15
16
17
> The Trust provides that on the death of the first spouse, the surviving spouse would continue to act as trustee.  However, at that time, the Trust assets were supposed to be divided into separate trusts.  As the Trust clearly states:  "On the death of the Deceased Spouse, the Trustee shall divide the Trust Estate . . . into three separate trusts, designated as the 'Survivor's Trust,' the 'Marital Trust,' and the 'Family Trust.'"  Here, Angelo died on March 27, 2008, at which time Lillian became the sole trustee and, according to the above language, was obligated to divide the Trust estate into separate trusts as provided in the Trust.
> . . .

18
19
20
21
> On the Subject of amendment or revocation, the Trust provides that during their joint lifetimes, Angelo and Lillian were free to revoke or amend the trust.  However, "[o]n the death of the Deceased Spouse, the Surviving Spouse shall have the power to amend, revoke or terminate the Survivor's Trust, but the Marital Trust or the Family Trust may not be amended, revoked, or terminated on the death of the Deceased Spouse."

22 *Merchant v. Pellegrini*, No. F072656, 2016 WL 6426389, at * 1-2 (Oct. 31, 2016) (unpublished).[1]

23

24 _____

25 [1] This summary does not represent any factual findings with respect to disputed aspects of the 1999 Trust, it is merely the Fifth DCA's summary of the trust provisions to provide factual context.

In her complaint before this Court, Lillian alleges a different operation of the 1999 Trust.  After inheriting money from Lillian's siblings Mike and Gladyce, Lillian and her husband Angelo created the Angelo Pellegrini and Lillian Dorothy Pellegrini Revocable Living Trust on June 18, 1999 (the "1999 Trust").  (Cmplt., p. 62.)[2]  In creating this Trust and "tax subtrusts," if either spouse continued to live while the federal estate tax exemption was being increased, the tax subtrusts would not be necessary and would not be funded.  (Cmplt., p. 12:17-20.)  By the Trust's terms, all assets contributed to the trust would retain their same character and ownership interests and the settlor contributing the property would retain control of that property during his/her lifetime.  Moreover, the Trust would remain subject to revocation during the survivorship period by the settlor contributing the property.  (Cmplt., p. 12:21-23, p. 62, Exh. 3.)  Lillian contributed her inherited separate property which comprised nearly all assets held in the Trust account.  Other financial assets contributed to the Trust had been titled in joint tenancy and were transferred.  The only other asset that was transferred to the Trust was residential property held by Angelo and Lillian as joint tenants.

In 2004, Angelo and Lillian amended the distribution clause of the Family Trust on the surviving spouse's death permitting a life estate to Beverly in the Trust's residential property, if then unsold.  (Cmplt., p. 63, Exh. 3.)  Two amendments "left the Family Trust void of any beneficiary designation, rendering the Family Trust a nullity and an invalid trust."  (*Id.*)

In March 2008, Angelo died.  Pursuant to the Trust terms, Lillian maintained unrestrained power of sale, and she sold the San Francisco real property within six months of Angelo's death, distributing the proceeds to her Survivor's Trust.  Shortly after this sale in 2008, Lillian revoked the Trust.  (Cmplt., p. 63, Exh. 3.)  Lillian also claims that in 2008, a Marital and Survivor's trust were funded, which she claims implied that the Family Trust was not intended to be funded on the first spouse's death.  (Cmplt., p. 14:5-11.)  Lillian asserts subsequent amendments to the 1999 Trust were

---

[2] All page numbers are made in reference to the CM/ECF pagination at the top of filed documents.

1  made in 2010, which rendered the Family Trust "void and a nullity for lack of any beneficiary

2  designation on the Surviving Settlor's eventual death." (Cmplt., p. 16:17-20.)

3  **B.      FCSC Proceedings**

4           In July 2010, Marleen successfully petitioned the FCSC for an order compelling Lillian to

5  provide an accounting of assets as of the time of Angelo's death and to provide information on how the

6  assets were allocated between the Survivor's Trust, the Marital Trust, and the Family Trust.   Lillian

7  filed a statement of trust assets as of March 27, 2008.  Among the assets purportedly allocated to the

8  Family Trust was one-half of the $800,000 value of a San Francisco residence.  The total value of

9  assets that Lillian, through her attorney, represented to have been allocated to the Family Trust was

10  $544,386.91.  In 2011, these representations regarding the Family Trust were repudiated by Lillian in a

11  letter written by her in response to a request by Marleen's attorney for further information and

12  accounting concerning the Family Trust.  Lillian stated that there were no assets in the Family Trust

13  and no assets were ever allocated or distributed to a Family Trust.

14           Purportedly based on this letter, in July 2012, Marleen filed a petition to remove Lillian as

15  trustee, appoint a successor trustee, and obtain other relief.  On January 13, 2014, Marleen filed an

16  additional petition seeking the recovery of property belonging to the Family Trust, for an award of

17  double damages under Probate Code § 859, and for an award of attorney's fees.

18           On June 17, 2014, the FCSC granted a motion to bifurcate the trial and determined two issues

19  would be tried first:  (1) whether the Family Trust was required to be funded after Angelo's death, and

20  (2) whether the title to real property in San Francisco maintained its joint tenancy characterization after

21  being transferred into the 1999 Trust.  (*See* Doc. 44-2, pp. 170-72, Exh. 16.)  On January 14, 2015, a

22  trial was conducted on these two issues, and the FCSC determined by clear and convincing evidence

23  that the Family Trust was required to be funded following the death of Angelo with a minimum of

24  $544,386.91.  (*Id.*)  The FCSC also found the San Francisco real property did not maintain its joint

25  tenancy characterization after being transferred to the 1999 Trust.  (*Id.*)

4

In May 2015, after holding a hearing, the trial court ordered the removal of Lillian as trustee of the Family Trust for failing to fund it after Angelo's death, and it appointed the Fresno County Public Guardian as the successor trustee. (Doc. 44-2, pp. 42-43, Exh. 2.) The May 2015 order also directed Lillian to fund the Family Trust in the amount of $544,386.91, and to pay this amount to the Public Guardian. (*Id.*) As to all remaining issues, a one-day court trial was set for August 25, 2015. (*Id.*)[3]

On trial of the remaining issues in August 2015, the trial court found that Lillian wrongfully and in bad faith took assets belonging to the Family Trust, and double damages were awarded pursuant to California Probate Code § 859 which Lillian was ordered to pay to the Public Guardian. (Doc. 44-2, pp. 45-47, Exh. 3.) Lillian was also ordered to pay Marleen's attorney's fees through the Public Guardian. In total, Lillian was ordered to pay $1,528,271.44 to the Public Guardian. (*Id.*)

On October 14, 2015, Lillian filed a document in the U.S. District Court for the Eastern District of California entitled "Request for Transfer to Federal Court 28 U.S.C. § 1441," which was construed as a notice of removal of the trial court proceedings over which this Court determined it had no jurisdiction; the case was remanded to the FCSC *sua sponte* less than one week later. (Doc. 44-2, pp. 49-84, Exh. 4; 1:15-cv-01564-LJO-EPG, Doc. 1.)

On October 19, 2015, the Public Guardian filed an ex parte application seeking to enforce FCSC's order requiring Lillian to fund the Family Trust and pay Marleen's attorney's fees through the Public Guardian and to freeze Lillian's UBS accounts. (Doc. 44-2, pp. 159-60, Exh. 13.)

On October 20, 2015, FCSC granted the Public Guardian's motion, froze Lillian's accounts at UBS until further order, and required UBS to transfer the sum of $1,528,271.44 to the Public Guardian. (Doc. 44-2, pp. 156-57, Exh. 12.) Lillian then appealed the trial court's orders to the Fifth DCA on November 15, 2015. (Doc. 44-2, p. 93, Exhibit 6.) On November 16, 2015, FCSC issued an ex parte

---

[3] Both the January 14, 2015, order and the May 15, 2015, orders were final and appealable when issued. Cal. Prob. Code § 1304(a). No appeal of these orders was taken within the 60-day time period to do so. Cal. Rules of Ct., rule 8.104(a)(1). Lillian did not file an appeal with the Fifth DCA until November 2015, after the second trial was held by FCSC. The Fifth DCA held that, to the extent Lillian was attempting to appeal the January 2015 and May 2015 orders, this portion of her appeal was untimely. (Doc. 44-2, pp. 19-21.)

1  order granting full authority to the Public Guardian to liquidate assets from Lillian's UBS accounts.

2  (Doc. 44-2, p. 162 (Exh. 14).)

3  **C.      Proceedings Before the California Fifth District Court of Appeal**

4           On November 16, 2015, Lilian filed a "Request for Writ of Supersedeas []," and the Fifth DCA

5  issued a temporary stay of FCSC's October 20, 2015, and November 16, 2015, ex parte orders in the

6  underlying case.  (Doc. 44-2, p. 93 (Exhibit 6).)  On December 4, 2015, the Fifth DCA issued an order

7  clarifying FCSC's October 20, 2015, ex parte order "freezing accounts held in the name of Lillian

8  Dorothy Pellegrini at UBS Financial Services, Inc." remained enforceable "insofar as it directs that 'no

9  transfers or withdrawals shall be made from the [specified] account[s] until further order of the Court.'"

10  (*Id.*)

11          On December 19, 2015, Lillian filed a "Request to Respond to Answer," and on January 6,

12  2016, Lillian filed a "Motion to Decide Writ of Prohibition."  (*Id*. at pp. 96-97.)  On January 19, 2016,

13  the Fifth DCA issued the following order regarding Lillian's motions:

14          The "Request to Respond to Answer" filed on December 10, 2015, and the "Motion to
         Decide Writ filed on January 6, 2016, are granted.   The "Request for Writ of
15          Supersedeas or the Alternative Writ of Prohibition . . . , " filed on November 16, 2015, is
         denied.  This court's November 18, 2015, stay order, and December 4, 2015, clarifying
16          order are vacated and the temporary stay is lifted.

17  (Doc. 45-2, p. 8.)

18          On October 31, 2016, the Fifth DCA issued an order affirming FCSC's judgment.  (Doc. 45-2,

19  p. 10-45.)

20  **D.      Proceedings Before This Court**

21          Prior to the Fifth DCA's October 2016 decision, Lillian filed suit in August 2016 in the U.S.

22  District Court for the Northern District of California naming as defendants Fresno County, Fresno

23  County Counsel, Fresno County Public Guardian, FCSC, UBS, BNY, Comerica, and "Weintraub

24  Tobin."  Lillian alleges the probate proceedings before FCSC were void for lack of jurisdiction, various

25  Defendants committed fraud on the court because they knew no Family Trust ever existed, FCSC

6

1    denied Lillian due process by failing to provide her notice of hearings and an opportunity to be heard;

2    and the Public Guardian, Weintraub Tobin, UBS, Comerica, and BNY were all complicit with and

3    participated in the fraudulent conveyance and conversion of Lillian's trust assets held in UBS accounts.

4    Lillian also alleges UBS breached her privacy in providing information to the Public Guardian without

5    her consent.

6          On August 30, 2016, the Northern District *sua sponte* determined venue was improper there and

7    transferred the case to the Eastern District where it determined venue was proper, finding that Lillian's

8    claims arose out of events that occurred in Fresno, California.  (Doc. 9.)

9          On October 31, 2016, Lillian filed a document entitled "Motion to Notify Court of a Conflict of

10   Interest by Lillian Pellegrini" – construed as seeking disqualification of the undersigned – and a second

11   document was filed by Lillian's daughter, Beverly Pellegrini, entitled "Notice – Federal Jurisdiction

12   Under Federal Rule of Civil Procedure 60; Intervenor by Right Under Federal Rule of Civil Procedure

13   24; Joinder Under Federal Rules of Civil Procedure 19."  (Docs. 14, 15.)

14         On November 3, 2016, Lillian was ordered to serve the complaint, and Beverly's motion entitled

15   "Notice – Federal Jurisdiction Under Federal Rule of Civil Procedure 60; Intervenor by Right Under

16   Federal Rule of Civil Procedure 24; Joinder Under Federal Rules of Civil Procedure 19" ("request to

17   intervene") was held in abeyance until such time as the Defendants were served and the motion was

18   properly re-noticed.  (Doc.16.)  Between December 27, 2016, and January 9, 2017, each Defendant

19   filed a motion to dismiss.  (Docs. 40, 42, 43, 44, 45, 46.)

20         On January 12, 2017, Lillian filed a motion for venue change and a motion to stay the

21   proceedings.  (Docs. 53, 54.)  On February 14, 2017, the Court denied Lillian's motions to transfer

22   venue, stay the proceedings, and to disqualify the undersigned.  (Doc. 76.)  The Court did not reach

23   Beverly's October 2016 request to intervene as it had never been re-noticed for a hearing and was not

24   properly before the Court.

25

1   On February 24, 2017, Beverly filed a "notice of appeal" seeking immediate appeal of the

2   Court's refusal to reach her request to intervene.  (Doc. 80.)  As Beverly's motion was never properly

3   re-noticed or set for a hearing and no order had therefore been issued regarding the matter of

4   intervention that could be appealed, the Court construed Beverly's "notice of appeal" as a motion for an

5   order on her request to intervene.  (Doc. 81.)  The Court set a hearing on this request, supplied the

6   parties with a briefing schedule, and continued Defendants' motions to dismiss to be heard concurrently

7   with Beverly's request to intervene.   (Doc. 81.)

8   ### III.   JUDICIAL NOTICE

9   Defendants UBS, Weintraub, and Fresno County each seek judicial notice of various court

10  documents.  (Docs. 43-2, 44-2, 43-2, 57, 97.)

11  ***UBS and Bank of NY Mellon's Request (Doc. 44-2)***:

12  *California Supreme Court Records*:  California Supreme Court Docket in Case No. S238760

13  (Doc. 44-2, Exh. 7).

14  *Fifth DCA Records*: (1) an October 31, 2016, order in *Merchant v. Pellegrini*, Case No.

15  F072656 (Doc. 44-2, Exh. 1); and (2) the Docket (Register of Actions) in Case No. F072656 (Doc. 44-

16  2, Exh. 6).

17  *FCSC Records and Filings, Case No. 10CEPR00683*:

18  • March 3, 2014, Memorandum of Points and Authorities in Support of Motion of Petitioner
    Marleen Merchant to Enforce Subpoenas (Doc. 44-2, Exh. 8)

19
20  • April 4, 2014, Further Reply of Petitioner Marleen Merchant to Opposition to Motion to
    Enforce Subpoenas (Doc. 44-2, Exh. 9)

21  • June 17, 2014 Order granting the Motion of Petitioner Marleen Merchant to Enforce Subpoenas
22    (Doc. 44-2, Exh. 10)

23  • August 8, 2014, FCSC Order Directing Compliance with Subpoenas (Doc. 44-2, Exh. 11)

24  • January 21, 2015, Finding and Order After Trial  (Doc. 44-2, Exh. 16)

25  • May 15, 2015, Order Removing Lillian D. Pellegrini as Trustee and Appointing Successor
    Trustee; Order Directing Lillian D. Pellegrini to Fund a Family Trust in the Amount of

1            $544,386.91 (Doc. 44-2, Exh. 2)[4]

2         • September 4, 2015, Findings and Order After Trial (Doc. 44-2, Exh. 3)

3         • October 20, 2015, Ex Parte Order Freezing Accounts Held in the Name of Lillian Dorothy
           Pellegrini at UBS Financial Services Inc. (Doc. 44-2, Exh. 12)

4

5         • October 20, 2015, Ex Parte Order Directing UBS Financial Services Inc. to Pay $1,528,721.44
           to the Fresno County Public Guardian as Successor Trustee of the Family Trust in Satisfaction
           of Court Orders  (Doc. 44-2, Exh. 13)

6

7         • November 16, 2015, Ex Parte Order Granting Full Authority to the Fresno County Public
           Guardian, as Successor Trustee, as to Liquidation of Family Trust Assets (Doc. 44-2, Exh. 14)[5]

8         • A January 22, 2016, Notice to Court and All Parties filed by UBS (Doc. 44-2, Exh. 15)

9         *Eastern District of California Orders and Filings in Case No. 1:15-cv-01564-LJO-EPG*: (1) an

10 October 14, 2015, document filed by Lillian Pellegrini entitled "Request for Transfer" (Doc. 44-2, Exh.

11 4); and (2) an October 20, 2015, Order of Remand (Doc. 44-2, Exh. 5).

12 **_Weintraub Tobin's Request (Doc. 45-2, Doc. 57)_:**

13         *California Supreme Court Records:*  California Supreme Court Order issued January 11, 2017,

14 denying Lillian's petition for review of the Fifth DCA's October 31, 2016, order (Doc. 57, Exh. A)

15         *Fifth DCA Records:*  (1) a November 18, 2015, Order (Doc. 45-2, Exh. A); (2) a December 4,

16 2015, Clarifying Order (Doc. 45-2, Exh. B)*;* (3) a January 19, 2016, order denying writ of supersedaes

17 and dissolving temporary stay (Doc. 45-2, Exh. C); and (4) an October 31, 2016, order in *Merchant v.*

18 *Pellegrini*, Case No. F072656 (Doc. 45-2, Exh. D).

19 **_Fresno County's Request (Doc. 43-2, 43-4)_:**

20         *Fifth DCA Records:* (1) a January 19, 2016, order denying writ of supersedaes and dissolving

21 temporary stay (Doc. 43-4, Exh. A); (2) a October 31, 2016, order in *Merchant v. Pellegrini*, Case No.

22 F072656 (Doc. 43-4, Exh. B).

23 ────────────────────

24 [4] A copy of this order is attached to Plaintiff's complaint.  (Doc. 1, p. 77-78.)

25 [5] A copy of this order is attached to Lillian's complaint.  (Doc. 1, p. 95-96.)

_Eastern District of California Orders and Filings in Case No. 1:15-cv-01564-LJO-EPG_:  (1) an October 14, 2015, document filed by Lillian Pellegrini entitled "Request for Transfer" (Doc. 43-4, Exh. C); (2) an October 14, 2015, document filed by Lillian Pellegrini entitled "Motion to Dismiss" (Doc. 43-4, Exh. D); (3) an October 14, 2015, document filed by Lillian Pellegrini entitled "Motion for Confidentiality" (Doc. 43-4, Exh. E); and (4) an October 20, 2015, _sua sponte_ order of the Eastern District of California, remanding Lillian Pellegrini's case to the FCSC (Doc. 43-4, Exh. F).

Under the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).

Rule 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  However, there are two exceptions to this rule: a court may consider material (1) which is properly submitted as part of the complaint, or (2) matters of public record that have been judicially noticed.  _Lee v. City of L.A._, 250 F.3d 668, 688-89 (9th Cir. 2001).

As orders of the court or documents filed with a court, all the documents identified by Fresno County, UBS, and Weintraub Tobin are subject to judicial notice as matters of public record.  _Harris v. Cnty. of Orange_, 682 F.3d 1126, 1132 (9th Cir. 2012).  The truth or the correctness of the factual content of these documents may _not_ be judicially noticed, but the _existence_ of the document or order and what the particular document states are subject to judicial notice.  _Lee v. City of L.A._, 250 F.3d 668, (9th Cir. 2001) (court may take judicial notice of another court's opinion, but not for the truth of the facts recited therein, but for the existence of the opinion).

Lillian argues the Court may not take judicial notice of these documents without converting Defendants' motions to dismiss into motions for summary judgment, but this is incorrect.  Judicial

notice of public documents is one of the long-standing exceptions to Rule 12(d)'s prohibition on considering documents outside the pleadings in relation to a motion to dismiss. *Lee*, 250 F.3d at 688-89. Defendants' requests for judicial notice are GRANTED.[6]

## IV. SUBJECT MATTER JURISDICTION

All Defendants except Comerica assert the Court lacks subject matter jurisdiction over Lillian's claims under the *Rooker-Feldman* doctrine, and they argue dismissal is required pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendants contend Lillian's claims amount to an impermissible collateral attack on FCSC's judgments.

### A.     Legal Standard – Motion to Dismiss Pursuant to Rule 12(b)(1)

"As courts of original jurisdiction, federal district courts have no authority to review the final determinations of a state court in judicial proceedings." *Branson v. Nott*, 62 F.3d 287, 291 (9th Cir. 1995) (citing *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983)); *Worldwide Church of God v. McNair*, 805 F.2d 888, 890 (9th Cir. 1986). "This is true even when the challenge to a state court decision involves federal constitutional issues." *Id.* (citing *Feldman*, 460 U.S. at 484-86; *Worldwide Church of God*, 805 F.2d at 891). This is so because, pursuant to 28 U.S.C. § 1257, the power to review a state court's judgment lies solely with the United States Supreme Court, not with federal district courts. *Feldman*, 460 U.S. at 476. In other words, "[t]he *Rooker-Feldman* doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments." *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 644 n. 3 (2002).

---

[6] The Court notes several of Defendants' requests for judicial notice overlap.

**B.      The Court Lacks Subject Matter Jurisdiction Under *Rooker-Feldman***

The *Rooker-Feldman* doctrine has been subject to criticism as overused and little understood.[7] In 2005, the United States Supreme Court revisited the doctrine in *Exxon Mobile Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 283 (2005) and reiterated it "is confined to cases of the kind from which it acquired its name:  cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments."  *Id.* at 284.  The Court clarified that where there is parallel state and federal litigation, *Rooker-Feldman* "is not triggered simply by the entry of judgment in the state court."  *Id.* at 292.  Moreover, section 1257 "does not stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously in state court."  *Id.* at 293.  Where a federal plaintiff "'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'"  *Id.* (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

In its most recent application by the Ninth Circuit Court of Appeals, a case cited with approval by the Supreme Court in *Exxon*, the *Rooker-Feldman* doctrine was held not to apply.  *Noel v. Hall*, 341 F.3d 1148 (9th Cir. 2003).  In *Noel*, the court observed that in its routine application, *Rooker-Feldman* is "exceedingly easy."  *Id.* at 1155.  However, the doctrine "becomes difficult – and, in practical reality, only comes into play as a contested issue – when a disappointed party seeks to take not a formal direct appeal, but rather its de facto equivalent, to a federal district court."  *Id.*

The court explained that it "is a forbidden de facto appeal under *Rooker-Feldman* when the plaintiff in federal district court complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court."  *Id.* at 1163.  A forbidden de facto appeal is brought in

---

[7] *See* Thomas D. Rowe, Jr., "Rooker-Feldman:  Worth only the Powder to Blow it Up?," 74 Notre Dame L. Rev. 1081, 1083 (1999) (observing the "notable frequency" with which federal courts invoke Rooker-Feldman to find they lack jurisdiction).

two kinds of cases: (1) where a "federal plaintiff complains of harm caused by a state court judgment that directly withholds a benefit (or imposes a detriment on) the federal plaintiff, based on an allegedly erroneous ruling by the court"; and (2) where a federal plaintiff complains "of a legal injury caused by a state court judgment, based on an allegedly erroneous legal ruling, in a case in which the federal plaintiff was one of the litigants." *Id.*

This litigation fits into the second type of case identified in *Noel*, and despite some of the noted difficulties and narrow scope of the *Rooker-Feldman* doctrine, it is applicable here. To determine whether *Rooker-Feldman* deprives the court of subject matter jurisdiction, "the immediate inquiry is whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting an independent claim." *Taylor v. Fed. Nat'l Mortg. Ass'n*, 374 F.3d 529, 531 (7th Cir. 2004). "Claims that directly seek to set aside a state court judgment are de facto appeals and are barred without additional inquiry." *Id.* Federal claims that were not raised in state court or that do not, on their face, require review of a state court's decision may still be subject to *Rooker-Feldman* if those claims are inextricably intertwined with a state court judgment. *Id.*

Lillian's injury for all Defendants' alleged conduct is the loss of UBS account assets resulting from FCSC's order that she pay $1,528,271.44 to the Family Trust through the Public Guardian. Lillian states she has sought a "dismissal" through the FCSC and the Fifth DCA before the order for payment was issued by the FCSC, but due to failures of due process and "through the courts' negligence, the property has been stolen and dismissal is too late." (Cmplt., p. 42:18-23.) Lillian maintains her "only remedy" now is to demand payment "of the full claim." Lillian asks this Court to enter a "default judgment" in her favor, and then order UBS to replace all her assets and reimburse Lillian for the associated costs, liabilities, and interest.

Although Lillian generally alleges violations of due process, and makes reference to fraud and conversion, none of her claims are pled distinctly as causes of action against particular Defendants. Rather, her complaint is an amalgamation of the various reasons why the FCSC lacked jurisdiction over

13

1   her trust, made incorrect legal determinations, and issued a judgment and orders that are void due to

2   fraud on the court.  Lillian's alleged injury from all Defendants' conduct is one in the same:  Lillian's

3   UBS accounts were levied to pay $1,528,271.44 to the Family Trust pursuant to the FCSC order; the

4   remedy she seeks is return of the $1,528,271.44 plus additional costs and interest.[8]  Although Lillian

5   does not explicitly ask to void the FCSC's judgment and orders, seeking recovery of the sum FCSC

6   ordered she pay to the Family Trust is tantamount to such a request.  In that sense, Lillian's entire

7   complaint is a de facto appeal of the FCSC judgment, which is barred under *Rooker-Feldman*.  *See*

8   *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 557 (7th Cir.1999) ("[A] litigant may not attempt to

9   circumvent the effect of *Rooker-Feldman* and seek a reversal of a state court judgment simply by

10  casting the complaint in the form of a civil rights action.").

11      Parsing Lillian's allegations into distinct claims, including claims for due process violations

12  against the FCSC as well as fraud and conversion claims against the remaining Defendants, these

13  claims are inextricably intertwined with the state court judgment and therefore are also barred under

14  *Rooker-Feldman*.  In *Feldman*, the Court expanded the doctrine to include claims that were inextricably

15  intertwined with the state court's ultimate decision.  *Feldman*, 460 U.S. at 486-87.  Inextricably

16  intertwined claims are those that would necessarily require the district court to review a judicial

17  decision of a state court, something the district court has no jurisdiction to do.[9]  *Id.*

18      Since *Feldman*, lower federal courts have formulated different criteria and rules for determining

19  which claims are "inextricably intertwined" with the state court's judgment such that *Rooker-Feldman*

20  applies.  The Ninth Circuit has embraced the GASH approach, named for the Seventh Circuit decision

21  formulating the approach, to determine whether claims are "inextricably intertwined."  *Noel*, 341 F.3d

22  at 1164 (citing *GASH Assocs. v. Village of Rosemont*, 995 F.2d 726 (7th Cir. 1993) ("Of the

23

24  [8] Lillian also claims she is entitled to double and triple damages under the California Probate Code §§ 859, 13605.  (Cmplt., p. 42.)

25  [9] There are very limited exceptions to this jurisdictional prohibition, including writs of habeas corpus under 28 U.S.C. § 2254.

1   formulations in the other circuits, we find most notable (and most useful) the similar formulation of the

2   Seventh Circuit, first articulated at some length by Judge Easterbrook in [*GASH*]")).   Under this

3   approach, whether a claim is "inextricably intertwined" "hinges on whether the federal claim alleges

4   that the injury was caused by the state court judgment, or, alternatively, whether the federal claim

5   alleges an independent prior injury that the state court failed to remedy."   *Taylor*, 374 F.3d at 533;

6   *GASH*, 995 F.2d at 728-29.   Thus, if a plaintiff is not seeking to set aside the state court judgment but

7   rather presents "some independent claim," even if it is one that denies a legal conclusion that a state

8   court has reached in a case to which he was a party, then *Rooker Feldman* does not apply and the

9   federal court has jurisdiction.   *Taylor*, 374 F.3d at 533.

10       Although Lillian asserts due process violations by the courts and the judges involved in the

11   underlying Probate proceedings,[10] the essence of her complaint is that FCSC improperly and

12   impermissibly determined she was required to fund the Family Trust when Angelo died in 2008, and

13   then erroneously ordered that she fund the Family Trust.   Adjudicating and deciding any due process

14   violation by the state court necessarily implicates FCSC's judgment, rendering those due process claims

15   against FCSC inexplicably intertwined with its judgment.

16       Lillian's claims against Fresno County, UBS, BNY, Comerica, and Weintraub Tobin for fraud

17   and conversion are somewhat more difficult, in part because the allegations are scattered, vague, and

18   conclusory.   Some allegations relate to these Defendants' compliance with the FCSC order that the

19   Family Trust be funded from Lillian's UBS account assets.   Lillian alleges that UBS, BNY, and

20   Comerica refused to stop the payment from her UBS account when she requested it, and that this

21   constituted conversion.  (Cmplt., pp. 27-30, 38-39.)   Lillian also alleges generally that in providing her

22   account information to the Public Guardian and in freezing her account *prior* to a court order to do so,

23   UBS breached its duties of privacy and breached a contract.   In essence, however, these allegations

24   _____

25   [10] Although there were allegations of various due process violations by different FCSC judges, none were identified as
Defendants.

stem from the FCSC's orders removing Lillian as trustee of the Family Trust, freezing Lillian's UBS accounts, and ordering distribution of Lillian's assets to the Family Trust via the Public Guardian.  An element of these claims necessarily requires that the FCSC orders executing its judgment were somehow void or invalid, thus implicating the underlying state court judgment.  Even to the extent Lillian alleges UBS froze her accounts before an order was in place to do so or otherwise impermissibly divulged information to the Public Guardian, the only damage she alleges as a result of this conduct is the loss of assets from her UBS account – which is directly tied to the FCSC order that she fund the Family Trust by making payment to the Public Guardian.  Moreover, the allegation that information was provided to the Public Guardian regarding her UBS accounts is fundamentally connected to the FCSC order appointing the Public Guardian successor trustee of the Family Trust and implicates the Public Guardian's rights and obligations as successor trustee to seek financial information.  Lillian vigorously contends the FSCS order appointing the Public Guardian as trustee was invalid, impermissible, and otherwise in violation of her rights.  Analyzing these allegations will necessitate an evaluation of FCSC's order that Lillian pay UBS trust assets to the Public Guardian. These claims are inextricably intertwined with the FCSC judgment.

Another portion of the allegations against Fresno County, Weintraub Tobin, and UBS relate to fraud on the court and alleged misrepresentations these Defendants made to the FCSC or the Fifth DCA regarding the nature of the Family Trust.  (*See, e.g.,* Cmplt., p. 28:23-26 (UBS colluded with Weintraub Tobin and Fresno County); p. 18:26-19:24) ("Weintraub Tobin knowingly and falsely claimed" in a 2012 petition that the Family Trust was created, and then claimed in a brief filed before the Fifth DCA that the trust was "supposed" to have been created, evidencing the misrepresentation in 2012).)

This is very similar to fraud-on-the-court claims considered by the Seventh Circuit in *Taylor,* 374 F.3d at 533.  There, the plaintiff-appellant, Taylor, lost her home in a judicial foreclosure action. Rather than directly appealing the state court judgment, Taylor filed a separate suit alleging the defendant mortgage company and its law firm committed extrinsic fraud and fraud upon the court by

1    instituting wrongful foreclosure actions against her in violation of federal statutes.  The defendants

2    removed the case to federal court where it was dismissed for lack of jurisdiction under *Rooker-*

3    *Feldman*.  On appeal, the court held Taylor's alleged injuries did not stem from an independent

4    violation of her rights, but from the alleged extrinsic fraud upon the state court and intentional

5    deprivation of her property that she claimed occurred due to that violation.  As such, the claims were

6    inextricably intertwined with the state court's judgment and barred by *Rooker-Feldman*.

7        Like *Taylor*, Lillian's allegations of fraud on the court do not arise from an independent

8    violation of her rights, but from the court processes she claims were in violation of her rights and from

9    purported misrepresentations various Defendants made in characterizing to FCSC the nature of the

10   1999 trust and the trust assets.  Notably, Lillian also alleges that FCSC knew about the fraud and was

11   complicit with it – which intertwines all the fraud allegations with the FCSC's orders and judgment.

12   (Cmplt., 20:26-21:2.)  There is no way to examine the alleged fraud on the court without evaluating

13   FCSC's underlying legal determinations.  *See Worldwide Church of God*, 805 F.2d at 892-93

14   (impossible to evaluate constitutional claims without conducting review of state court's legal

15   determinations and jury verdict, thus *Rooker-Feldman* applied to constitutional claims).  Lillian's

16   allegations of fraud on the court against Fresno County, UBS, Weintraub Tobin are inextricably

17   intertwined with FCSC's legal determinations and its judgment.[11]

18

19

---

20   [11] Lillian alleges UBS filed a document before FCSC containing a "wrongful death ransom" against Beverly, but this is
     difficult to frame as a "claim" for relief.  The allegation of "wrongful death ransom" seemingly relates to a January 2016
21   notice filed by UBS in the FCSC case, but that filing contains no words that could be construed as a "wrongful death
     ransom."  (*See* Doc. 97.)  The Court considers that allegation in more depth below, but standing alone, it is difficult, if not
22   impossible, to construe this as a claim for relief, particularly as Lillian has no standing to seek any relief on Beverly's behalf,
     and there is no allegation relating to Lillian herself.

23   Lillian's bare allegation against Comerica is that it may have been the depository bank for the Public Guardian and it would
     not respond to Lillian's request to stop payment and return her UBS funds.  (Cmplt., pp. 38-39.)  Construing this assertion as
24   some type of claim, it is still inextricably intertwined with FCSC's order requiring payment be made to the Public Guardian
     and cannot be considered without examining FCSC's underlying legal determinations.

25

1   Because Lillian's complaint amounts to a de facto appeal of FCSC's legal determinations in the

2   underlying probate matter, and because all other allegations that can be construed as claims against

3   various defendants are inextricably intertwined with FCSC's legal determinations and judgments, the

4   Court finds it lacks subject matter jurisdiction over Lillian's complaint under the *Rooker-Feldman*

5   doctrine, and it is DISMISSED.

6                           **V.   BEVERLY'S REQUEST TO INTERVENE**

7         As the Court finds it is without subject matter jurisdiction over Lillian's complaint, there can be

8   no jurisdiction over any complaint in intervention filed by Beverly.   *See Canatella v. California*,

9   404 F.3d 1106, 1113 (9th Cir. 2005) (intervention as of right cannot extend federal jurisdiction);

10  *Mattice v. Meyer*, 353 F.2d 316 (8th Cir. 1965) (where no action was pending since plaintiff was

11  without standing to initiate an action, person who sought to intervene as co-plaintiff could not complain

12  on appealed that he was not allowed to do so); *Hobbs v. Police Jury of Morehouse Parish*, 49 F.R.D.

13  176 (D. La. 1970) (intervenor takes case as he finds it and may not intervene if there is no proper suit

14  before the court); *see also* 7C Fed. Prac. & Proc. § 1917 (3d ed.) (2017) (intervention presupposes the

15  pendency of an action in a court of competent jurisdiction and cannot create jurisdiction if one existed

16  before).

17        Even if there were jurisdiction over some claim in Lillian's complaint, for all the reasons set

18  forth below, the request for intervention is DENIED.

19  **A.   Beverly and Lillian's Request "for Intervenor by Right or Joinder"**

20        Aside from the jurisdictional issue, the Court notes the procedural awkwardness of Beverly's

21  request to intervene.  Beverly is not eligible to represent Lillian before this Court because she is not

22  admitted to the California Bar, and she is not eligible to practice before this Court pro hac vice.

23  Nevertheless, Beverly continues to draft and file all Lillian's papers in this case:

24        Lillian Pellegrini is Settlor/Trustee and competent but she lacks legal skill and acumen
          to be able to prepare and file her own papers by herself.  Lillian Pellegrini and Beverly
25        Pellegrini discuss all legal issues completely and thoroughly and all filings are read

1     aloud to Lillian Pellegrini to facilitate her comprehension and compensate for her

2     diminished vision acuity . . . [w]ithout representation, Lillian Pellegrini has relied on
services provided by Beverly Pellegrini.

3   (Doc. 15, 9:19-27.)

4        At the February 13, 2017, hearing on Lillian's motions to stay, to transfer venue, and to

5   disqualify the undersigned, the Court explained to Lillian that if she were unable to represent herself,

6   she would need to retain counsel, which could not be her daughter Beverly.  The request to intervene is

7   signed by both Beverly and Lillian, and they both request that "the District Court grant the motion for

8   intervention by right or in the alternative, grant joinder under Federal Rule 19 to permit Beverly

9   Pellegrini" to participate in the litigation.  (Doc. 15, 10:27-11:2.)  It appears some of the motivation to

10  intervene stems from Lillian's purported inability to represent herself in pro se.[12]

11       The request to intervene first asserts the Court has jurisdiction over claims of an intervenor

12  under 28 U.S.C. §1367, and then asserts the Court has jurisdiction under Federal Rule of Civil

13  Procedure 60 due to "fraud on the Court that was perpetrated with an intent and knowledge to steal

14  property from Lillian Pellegrini."  (Doc. 15, 2:2-3.)

15       Beverly and Lillian request that Beverly be permitted to intervene as a matter of right or that she

16  be joined under Rule 19.  The basis for this request is articulated, in relevant part, as follows:

17     The property involved in this action before the District Court is property that is owned
by and belongs to Lillian Pellegrini, over which Lillian Pellegrini retained control since

18     acquisition through inheritance in 1999 from her siblings['] estates.  This property was
stolen from her revocable trust through the unauthorized sale of invested assets and the

19     proceeds were withdrawn without notice or authorization.

20     Beverly Pellegrini was appointed co-trustee to protect Lillian Pellegrini's rights
to her property and income and to protect trust assets to generate wealth.  Beverly

21     Pellegrini is also a named beneficiary of this trust and is a named beneficiary of a
general power of appointment.  Because Beverly Pellegrini, as beneficiary, has an

22     interest in the property that was stolen and an obligation by contract to protect Lillian
Pellegrini's rights to her property, Beverly Pellegrini has a right of intervention to protect

23     her interest.  By protecting her interest, she is also protecting the preceding interest of

24

25  [12] Given the coordination of this lawsuit between Lillian and Beverly noted above, it is unclear why Beverly was not added
as a co-plaintiff from the outset.

1    the real party of interest, Lillian Pellegrini, as owner and as Settlor/Trustee.

2           The matter before this District Court is the recovery of the unauthorized sale of
     invested assets and withdrawal of proceeds that has caused substantial financial harm to
3    Lillian Pellegrini and future beneficiaries.   The property was stolen through extrinsic
     fraud and fraud on the Court by prohibiting any semblance of due process when the
4    Court lacked statutory authority to exercise any jurisdiction over Lillian Pellegrini or her
     property held in any of her trusts at any time and the Court thereby exceeded its
5    jurisdiction to permit stealing and conversion of assets owned by Lillian Pellegrini. The
     liquidation has caused an overall loss resulting from the unauthorized sale of
6    investments and denied income and growth and wealth for which Beverly Pellegrini was
     requested by Angelo Pellegrini and Lillian Pellegrini to help preserve through her
7    investment experience as a securities analyst of a broad spectrum of industries and
     understanding of financial markets and economics.

8

9    (Doc. 15, 8:3-23.)   Lillian and Beverly maintain that Beverly's intervention is necessary to protect

10   Beverly's interests as a beneficiary of the trust, and, on her own, Lillian lacks the legal and physical

11   skills necessary to adequately defend Beverly's interests.

12   **B.     Legal Standards**

13          **1.     Intervention As of Right**

14          Federal Rule of Civil Procedure 24(a)(2) provides for intervention as of right where the

15   potential intervenor "claims an interest relating to the property or transaction that is the subject of the

16   action, and is so situated that disposing of the action may as a practical matter impair or impeded the

17   movant's ability to protect its interest, unless existing parties adequately represent that interest."   The

18   Ninth Circuit has articulated four requirements for intervention as of right under Rule 24(a)(2):

19          (1)[T]he [applicant's] motion must be timely; (2) the applicant must have a 'significantly
            protectable' interest relating to the property or transaction which is the subject of the
20          action; (3) the applicant must be so situated that the disposition of the action may as a
            practical matter impair or impeded its ability to protect that interest; and (4) the
21          applicant's interest must be inadequately represented by the parties to the action.

22   *Freedom from Religion Found v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011) (quoting *Cal. Ex rel.*

23   *Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006)).   Proposed intervenors must meet all four

24   criteria, and "[f]ailure to satisfy any one of the requirements is fatal to the application."   *Perry v.*

25   *Proposition 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009).   In evaluating motions to

intervene, "courts are guided primarily by practical and equitable considerations, and the requirements for intervention are broadly interpreted in favor of intervention." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004). "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in invention, and the declarations supporting the motion as true absent sham, frivolity or other objections." *Sw. Ctr. For Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

### 2. Permissive Intervention

Under Federal Rule of Civil Procedure 24(b)(1), "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Permissive intervention "requires (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found.*, 644 F.3d at 843 (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.3d 470, 473 (9th Cir. 1992)). "Even if an applicant satisfies those threshold requirements," however, "the district court has discretion to deny permissive intervention." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). "[T]he court may also consider other factors in the exercise of its discretion, including 'the nature and extent of the intervenors' interests' and 'whether the intervenors' interests are adequately represented by other parties.'" *Perry*, 587 F.3d at 955 (quoting *Spangler v. Pasadena City Bd. Of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977)).

Both permissive and intervention as of right motions must be served on all parties, "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).

### 3. Amendment of the Complaint to Join A Party under Rule 15

Federal Rule of Civil Procedure 15(a)(2) requires the court to "freely give" leave to amend a

pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2).  This policy is "applied with extreme liberality."  *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001).  It is within the court's discretion whether to grant or deny leave to amend.  *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate a decision on the merits, rather than on the pleadings or technicalities."  *Id.*  In considering requests to amend, courts analyze the following factors: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether plaintiff has previously amended her complaint.  *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990).

**C.  Request for Intervention under Rule 24 is DENIED**

   **1.  Lillian and Beverly's Motion for Intervention or Joinder is Procedurally Defective**

   Initially, no matter how the October 2016 request is construed – whether as a motion to intervene or a motion to amend the complaint to add Beverly as a plaintiff – the motion is defective. Any motion for intervention under Rule 24 requires the motion to "be accompanied by a pleading that sets out the claim or defense for which intervention is sought."  Fed. R. Civ. P. 24(c).  No proposed pleading has been submitted to the Court.  Lillian and Beverly's request indicates that, if Beverly is permitted to intervene, an addendum to the complaint "will include" causes of action under 18 U.S.C. §§ 1961, 1962, 1956, and 1957,[13] code sections promulgated under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  This citation to various code sections is insufficient for the Court to infer the substance of the claims Beverly wishes to assert under RICO.

   The same is true of a motion to amend the complaint to name Beverly as a plaintiff.  Rule 137(c) of the Local Rules for the U.S. District Court, Eastern District of California, states in pertinent part that, "[i]f filing a document requires leave of court, such as an amended complaint after the time to

---

[13] 18 U.S.C. §§ 1957, 1958 are criminal statutes that do not contain a private right of action.

22

1   amend as a matter of course has expired, counsel shall attach the document proposed to be filed as an

2   exhibit to the moving papers seeking such leave." The Court has discretion to deny a motion to amend

3   for failure to attach a proposed pleading as required by local rule. *Waters v. Weyerhaeuser Mortgage*

4   *Co.*, 582 F.2d 503, 507 (9th Cir. 1978). As noted above, Beverly has failed to attach a proposed

5   amended complaint or describe the new claims in sufficient detail. A court's ability to evaluate the

6   propriety of a motion to amend a pleading is hampered when the moving papers do not describe the

7   proposed amendments in sufficient detail or attach the proposed amended pleading. *United States v.*

8   *Molen*, No. 2:10-cv-02591-MCE-KJN, 2011 WL 3678431, at *2 (E.D. Cal. Aug. 22, 2011). As either a

9   request for intervention or a motion to amend, the request is procedurally deficient without a proposed

10  pleading.

11          **2.        Lillian and Beverly's Motion for Intervention is Substantively Defective**

12          In considering the intervention of right factors set forth by the Ninth Circuit in *Geithner*, 644

13  F.3d at 841 the motion is timely as the pleadings have not closed and no schedule has yet been set.

14  Given this posture, Beverly's intervention does not pose a risk of undue prejudice to Defendants. *See*

15  *United States v. Oregon*, 745 F.2d 550, 552 (9th Cir. 1984).

16          The second factor, whether the applicant has a significant protectable interest, is fatal to the

17  request. An applicant seeking intervention has a significant protectable interest in an action if (1) she

18  asserts an interest that is protected under some law, and (2) there is a "relationship between its legally

19  protected interest and the plaintiff's claims." *Nw. Forest Resource Council v. Glickman*, 82 F.3d 825,

20  837 (9th Cir. 1996). In addition, an applicant to intervene must be "so situated that disposing of the

21  action may as a practical matter impair or impede" her ability to protect her interest. Fed. R. Civ. P.

22  24(a)(2). Beverly claims that she is a co-trustee with Lillian, and she is also a beneficiary of the trust.

23  However, these allegations are conclusory – there is no allegation when Beverly was made co-trustee,

24

25

1   of what particular trust she is co-trustee, or of what trust she is beneficiary.[14]   It is simply too vague and

2   conclusory to assert co-trustee and beneficiary status of the trust to allege a significant protectable

3   interest.   Moreover, this allegation is facially contradicted by Lillian's complaint which states that

4   Lillian "is the only party of interest as Settlor, Trustee and sole Beneficiary of the [1999 Trust]."

5   (Cmplt., 3:26-28.)  Lillian also asserts she revoked the trust sometime in 2008.  (Cmplt., p. 63, Exh. 3.)

6        Moreover, even assuming Beverly has a significant protectable interest, Beverly and Lillian

7   have not shown that Lillian will not adequately represent Beverly's interests.   Courts consider three

8   factors in assessing whether the present party will adequately represent the interests of the proposed

9   intervenor:  (1) whether the interest of present party is such that it will undoubtedly make all of a

10  proposed intervenor's arguments; (2) whether the present party is capable and willing to make such

11  arguments; and (3) whether a proposed intervenor would offer any necessary elements to the

12  proceeding that other parties would neglect.  *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003).

13  The "most important factor in determining adequacy of representation is how the interest compares

14  with the interests of the existing parties.  When an applicant for intervention and an existing party have

15  the same ultimate objective, a presumption of adequacy of representation arises." *Id.*

16       Beverly and Lillian's argument as to adequacy of representation focuses on Lillian's physical

17  limitations that preclude her from representing herself and the inability to locate and retain counsel.

18  This is essentially an argument that, although Beverly is ineligible to represent her mother before this

19  Court, Beverly wishes to become a party so she can litigate the case on her own and Lillian's behalf.

20  Under these circumstances, Beverly has not established Lillian is *unwilling* or *legally incapable* of

21  making all Beverly's arguments with regard to the claims regarding Lillian's trust.  Rather, Lillian

22  "lacks legal skill and acumen to be able to prepare and file her own papers by herself."  If that is true,

23  Lillian cannot proceed pro se with the case – adding Beverly to the suit as a plaintiff does not cure

24

25  [14] In her reply brief, Beverly states a UBS account statement attached to the complaint bears her name as co-trustee, which is sufficient to establish this fact.  This bare reference on an account does not provide any details regarding which trust Beverly is co-trustee or when this occurred.

1  Lillian's inability to represent herself.  Intervenor is not a mechanism whereby an unrepresented

2  plaintiff hands off her case to another party to litigate it on her behalf.  There is no showing that

3  Beverly's interests diverge from Lillian in some way that requires Beverly's presence in the litigation.

4  For these reasons, Lillian and Beverly's request to intervene as of right is both substantively and

5  procedurally flawed and cannot be granted.

6      These same deficiencies preclude Beverly's request for permissive intervention.  It is not clear

7  how Beverly's interests diverge from that of her mother, such that Beverly needs to intervene to protect

8  her own interests.  Without a proposed amended complaint, the jurisdictional basis of the complaint in

9  intervention is not ascertainable, and the Court cannot evaluate the viability of any claims under RICO

10 Beverly states she wishes to file.  Both procedurally and substantively, the request for permissive

11 intervention is defective and cannot be granted.

12 **D.   Amendment to Add Beverly as A Party under Rule 15 is DENIED**

13      Finally, even construing this filing as a motion to amend the complaint simply to add Beverly as

14 a plaintiff, the request cannot be granted.  While amendment to the complaint should be freely granted,

15 where the amendment is futile a request to amend will not be granted.  *Chang v. Chen*, 80 F.3d 1293,

16 1296 (9th Cir. 1996).  For the reasons discussed below, Lillian's claims are not viable, even assuming

17 the Court has subject matter jurisdiction.  Beverly will be precluded from litigating these claims to the

18 same degree as Lillian, and thus amending the complaint to add her as a party is futile.  With respect to

19 additional claims Beverly wishes to file against Defendants under RICO, those claims were not

20 properly presented to the Court in the form of a proposed amended complaint.  For all the reasons set

21 forth above, Beverly and Lillian's request to intervene is DENIED.

22      **VI.  DEFENDANTS' MOTIONS TO DISMISS ARE GRANTED**

23      The Court finds it lacks subject matter jurisdiction over Lillian's claims as a de fact appeal of

24 the FCSC judgment in the underlying probate matter prohibited by *Rooker-Feldman*.  Even if the Court

25 had jurisdiction over any of Lillian's claims, however, none are viable, and Defendants' motions to

1  dismiss must be granted.

2  **A.      Standard of Decision – Motion to Dismiss Pursuant to Rule 12(b)(6)**

3          A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations

4  set forth in the complaint.  Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a

5  cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."

6  *Balisteri v. Pacifica Police Dep't*., 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion to

7  dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint,

8  construes the pleading in the light most favorable to the party opposing the motion, and resolves all

9  doubts in the pleader's favor.  *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

10         To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim

11  to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim

12  has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the

13  reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556

14  U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks

15  for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550

16  U.S. at 556).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

17  factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires

18  more than labels and conclusions."  *Twombly*, 550 U.S. at 555 (internal citations omitted).  Thus, "bare

19  assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements'. . . are not

20  entitled to be assumed true."  *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth,

21  allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice

22  and to enable the opposing party to defend itself effectively."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th

23  Cir. 2011).  In practice, "a complaint . . . must contain either direct or inferential allegations respecting

24  all the material elements necessary to sustain recovery under some viable legal theory."  *Twombly*, 550

25  U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, a

1   plaintiff should be afforded leave to amend.  *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv.,*

2   *Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

3   **B.      FCSC's Motion to Dismiss is GRANTED**[15]

4          Beyond the jurisdictional argument under *Rooker-Feldman*, FCSC contends Lillian's claims

5   against it are barred by the Eleventh Amendment of the U.S. Constitution and precluded by judicial

6   immunity; moreover, even if Lillian's claims were somehow cognizable, they must be dismissed for

7   failure to comply with the California Government Claims Act.  (Doc. 42-1.)

8          Lillian's claims against FCSC, as can be cobbled together from the amorphous allegations of the

9   complaint, relate entirely to FCSC's adjudication of the trust administration issues that arose in *In re*

10  *The Angelo John Pellegrini and Lillian Dorothy Pellegrini Revocable Living Trust, dated June 18,*

11  *1999*, Case. No. 10CEPR00683, Fresno County Superior Court.  Lillian alleges FCSC acted without

12  any jurisdiction over the 1999 Trust and its orders where therefore void; FCSC was without jurisdiction

13  to appoint a trustee over the Family Trust, since that trust never existed (Cmplt., 24:1-4); it violated

14  rules of due process by granting and imposing injunctions without notice or a hearing (Cmplt., 21:24-

15  28, pp. 23-24); and it was without any jurisdiction to order UBS to furnish Lillian's account information

16  or to freeze and levy Lillian's UBS account (Cmplt., pp. 24-25).  Lillian also alleges FCSC "facilitated

17  the fraud" by denying due process in issuing rulings before trials or hearings took place, denying

18  Beverly Pellegrini a chance to be heard or permitted to be present at hearings; ignored evidence related

19  to the existence of the Family Trust; and lacked any authority to issue orders regarding Lillian's trust

20  property.  (Cmplt., pp. 31-35.)

21          **1.      The Eleventh Amendment Bars Lillian's Claims Against FCSC**

22          FCSC contends the Eleventh Amendment bars suits seeking either damages or injunctive relief

23  against a state, an arm of the state, its instrumentalities, or its agencies.  State courts are state entities

24  ────────────────

25  [15] FCSC filed two identical motions to dismiss.  (Docs. 40, 42.)

for the purposes of the Eleventh Amendment, and thus FCSC maintains it is immune from Lillian's claims which arise out of its official actions in adjudicating the underlying trust administration proceedings.  The Court agrees.

Put simply, Lillian can state no claim against FCSC (or its employees) pertaining to its adjudication of her trust in probate proceedings because such suits are barred by the Eleventh Amendment.  *Simmons v. Sacramento*, 318 F.3d 1156, 1161 (2003) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) (holding that "'arms of the State' for Eleventh Amendment purposes" are not liable under § 1983)); *Greater L.A. Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1110 (9th Cir. 1987) ("We conclude that a suit against the Superior Court is a suit against the State, barred by the eleventh amendment.")).

### 2.    FCSC's Additional Arguments

As the Court finds Lillian's claims against FCSC are barred by the Eleventh Amendment, it does not reach FCSC's alternative arguments pertaining to immunity and the Government Tort Act.  Even if the *Rooker-Feldman* doctrine does not deprive the Court of jurisdiction, Lillian's claims against FCSC must be dismissed with prejudice as barred by the Eleventh Amendment.

## C.    UBS and BNY's Motion to Dismiss is GRANTED

Beyond arguing *Rooker-Feldman* deprives the Court of jurisdiction over Lillian's complaint, UBS and BNY contend Lillian's claims against them are subject to dismissal under the doctrines of res judicata, collateral estoppel, law of the case, and the Anti-Injunction Act, 28 U.S.C. § 2283.  UBS and BNY also contend Lillian's claims must be dismissed as vague, unsupported, and unintelligible.

Lillian alleges UBS colluded with Marleen Merchant's counsel, Weintraub Tobin, to release Lillian's UBS account statements pursuant to Marleen's subpoena *before* FCSC had a chance to rule on Merchant's petition to enforce the subpoenas.  (Cmplt., 27:15-18.)  She also claims UBS released statements to the Public Guardian in August 2015 that were not the statements requested and those statements were furnished without prior notice or authorization from Lillian.  Lillian asserts UBS knew

1  that she was the settlor of the 1999 Trust, that no Family Trust was ever created, and that she intended

2  to sell the San Francisco real property in 2008.  She claims that UBS agreed "to conform to the

3  demands of Weintraub Tobin and Fresno County," knowingly and intentionally aiding and abetting the

4  conversion and theft of her UBS assets.  (Doc. 1, Cmplt., p. 27-30.)  She contends UBS breached her

5  right to privacy in her accounts and froze her account in September 2015 before any court order or

6  ruling was issued; breached its contract by harassing her for unnecessary private information; made a

7  "wrongful death ransom" against Beverly's life; and demanded she remove all her accounts from UBS

8  within a week or face further liquidation.

9        1.        **Issue Preclusion Bars Certain Claims Against UBS**[16]

10        UBS contends Lillian's claims are barred by the doctrine of issue preclusion.  As the Court

11  understands Lillian's allegations, her claims of fraud, unspecified privacy violations, breach of contract,

12  and "wrongful death ransom" spring directly from UBS' compliance with FCSC's orders directing UBS

13  to comply with Marlene Merchant's 2014 subpoena requests; to freeze Lillian's UBS accounts pursuant

14  to the October 20, 2015, order; to allow the Fresno County Public Guardian access and discretion to

15  direct UBS on what assets in Lillian's account to liquidate; and to pay $1,528,271.44 to the Public

16  Guardian.  Lillian's claims are premised on the notion that FCSC had no jurisdiction to issue any orders

17  regarding the trust assets, and that UBS acted in a spurious and unlawful manner in carrying out

18  FCSC's orders.

19

20  _____

21  [16] Even if Beverly were added as co-plaintiff, her claims would be barred by issue preclusion to the same extent as Lillian because she and Lillian are in privity.  To determine privity, courts examine the practicalities of the situation and determine

22  whether the parties are sufficiently close to afford application of the principles of preclusion.  *Armstrong v. Armstrong*, 15 Cal. 3d 942, 951 (1976).  Privity may be established by "a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights."  *Citizens for Open*

23  *Access to Sand & Tide, Inc. v. Seadrift Ass'n*, 60 Cal. App. 4th 1053, 1069 (1998) (internal citations omitted).  Privity "has also been expanded to refer to . . . a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application" or preclusion.  *Id.* at 1069-70.  Privity will also be found

24  where the two parties have a "sufficient commonality of interests."  *Tahoe-Sierra Preservation Council, Inc. v Tahoe Regional Planning Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003).  In her motion to intervene, Beverly alleges she and Lillian are co-trustees.  As such, they share a sufficient commonality of interests in the trust and its assets to establish privity in the

25  underlying lawsuit regarding administration of the trust.

1    Issue preclusion can be invoked by one not a party to the first proceeding, such as UBS, against

2  a party who had a "full and fair opportunity to litigate the issue in the first case but lost," such as

3  Lillian.  *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 820 (2015).  The underlying objective is to

4  preclude a party from re-litigating an issue that has been finally decided against that party in a prior

5  suit.  *Id.*

6    Issue preclusion prohibits the re-litigation of issues argued and decided in a previous case, even

7  if the second suit raises different causes of action.   Issue preclusion will apply "(1) after final

8  adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and

9  (4) asserted against one who was a party to the first suit or one in privity with that party."  *Id.* at 819.

10    Here, Lillian had a full and fair opportunity to litigate in the underlying proceeding whether the

11  Family Trust existed and should have been funded at the time of Angelo's death in 2008, the amount

12  the Family Trust should have been funded, and whether Lillian was fit to act as trustee of the Family

13  Trust.   Those identical issues were finally decided against Lillian by FCSC in the underlying case,

14  which was affirmed by the Fifth DCA, and Lillian's petition for review before the California Supreme

15  Court was denied.[17]   The requisite elements for issue preclusion are satisfied, and Lillian cannot state a

16  cause of action that seeks to re-litigate the issue of whether the Family Trust existed or whether and

17  how much it should have been funded.   Lillian maintains UBS had information showing the Family

18  Trust never existed.   (Cmplt., 27:5-29:11.)   The existence of the Family Trust, the amount it should

19  have been funded, and whether Lillian could serve as trustee were finally decided and are not subject to

20  re-litigation.   Lillian cannot state a fraud claim against UBS based on a theory the Family Trust never

21  existed.[18]

22

---

23  [17] FCSC's January 2015 and May 2015 orders were final and appealable when issued, and no appeal was taken within the
24  60-day period.  Cal. Prob. Code § 1304(a); Cal. Rules of Ct., rule 8.104(a)(1).  Lillian appealed in November 2015, and
     FCSC's orders were affirmed.  Lillian sought review by the California Supreme Court, which was summarily denied on
     January 11, 2017.  The FCSC's orders and legal determinations are all now final.

25  [18] The allegations against UBS asserting it worked a fraud on the court in conjunction with Weintraub Tobin and Fresno

30

1    Lillian's allegations of privacy violations and contract breach appear to stem from UBS

2    providing account statements to the Public Guardian.  Lillian, however, was removed as Trustee of the

3    Family Trust as of May 2015, and the Public Guardian was appointed by FCSC as successor trustee.

4    There is no allegation by Lillian how, in its role as trustee, the Public Guardian was not entitled to

5    account information pertaining to funding of the Family Trust.  This allegation suggests that the Public

6    Guardian was not entitled to account information, which in essence seeks to re-litigate the appointment

7    of a successor trustee.

8    Lillian's allegations that UBS wrongfully paid the Public Guardian out of her UBS accounts do

9    not and cannot form the basis of a cognizable claim.  The issue of whether assets from the UBS account

10   were to be paid to the Family Trust was decided by FCSC in the underlying litigation.  UBS' actions in

11   complying with FCSC's judgment and its orders enforcing its judgment cannot form the basis of a

12   legitimate cause of action because it necessarily seeks to re-litigate whether Lillian was required to fund

13   the Family Trust.

14        **2.       Lillian's Remaining Allegations Do Not Constitute Viable Claims**

15   Lillian also alleges UBS froze her accounts before FCSC issued any order requiring it to do so,

16   which resulted in an IRS payment being rejected by UBS.  However, Lillian concedes the IRS check

17   was resubmitted for payment and penalties were paid by UBS.  (Cmplt., p. 29:24-28.)  As a result,

18   Lillian has alleged there were no damages stemming from this "freeze" of her UBS account.  To the

19   extent there is any alleged wrongdoing by UBS in rejecting the IRS check or freezing the account at

20   some point prior to the FCSC's October 20, 2015, order, there were no damages suffered, and the claim

21   is not viable.

22   Lillian's allegations pertaining to UBS' "wrongful death ransom" are difficult to understand.

23   Lillian alleges that

24

25   County are considered in Weintraub Tobin's motion to dismiss below.

UBS liquidated securities through Mike Williams Branch Manager on January 21-22, 2016.  Keesal Young & Logan filed a WRONGFUL DEATH RANSOM with Fresno Superior Court (also filed with the Fifth District Court of Appeal) stating that Lillian Pellegrini could keep her funds if Beverly Pellegrini's life were abruptly ended.

(Doc. 1, Cmplt., 30:5-8.)  The document filed by UBS in January 2016 on the FCSC docket, which is judicially noticed,[19] contradicts Lillian's allegation in this regard.  On January 22, 2016, UBS filed a "Notice to the Court and All Parties" with FCSC which states that

> 7.     On or about January 21, 2016, UBS became concerned about the welfare of Ms. Lillian Pellegrini's daughter, Beverly Pellegrini, who has repeatedly and recently threatened to harm or kill herself should UBS comply with the Court's Pay Order and pay $1,528,271.44 to the Public Guardian.

> 8.     Also on January 21, 2016, UBS' counsel, Audette Paul Morales, alerted the City of Fresno Police Department (the "Fresno PD") about Ms. Beverly Pellegrini's threats to harm or kill herself.  The Fresno PD advised it would send officers to the Pellegrini home to conduct a welfare check on the Pellegrinis.  As of the date of this *ex parte* petition, UBS is unaware of the results of said welfare check.

(Doc. 97, ¶¶ 7-8.)   This document does not state that Lillian could keep her funds if "Beverly Pellegrini's life were abruptly ended."  Although there is no specific document referenced by Lillian in her complaint with regard to this "Wrongful Death Ransom" allegation, this is the only document filed by UBS with FCSC at that time.  Lillian's allegation that UBS filed a "wrongful death ransom" is contradicted by the FCSC docket, and the Court need not assume the truth of this fact.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (court need not accept as true allegations that contradict facts which may be judicially noticed).[20]  Moreover, Lillian has no standing to assert a claim on Beverly's behalf, and there are no allegations in this regard that pertain to Lillian.

Typically, leave to amend a complaint should be granted, unless it is clear that Lillian's claims against UBS cannot be saved by amendment and any attempt to do so would be futile.  *Chang*, 80 F.3d

---

[19] To be clear, the Court has taken judicial notice of *what* was filed on the FCSC docket by UBS in January 2016 – not the *truth* of the *contents* of that filing.  (Doc. 97.)

[20] Whether or not the content of the "Notice" filed by UBS is true, it simply does not say what Lillian alleges it does.

at 1296.   The fraud and privacy allegations against UBS, aside from being overly vague and conclusory, are predicated on issues that were fully litigated by FCSC in the underlying case and decided against Lillian.   Lillian cannot re-litigate those issues in this Court, even though framed inside a different claim.   The wrongful death ransom allegation is contradicted by the text of UBS' state court filing in January 2016, and there are no damages alleged.   None of Lillian's purported claims against UBS can be cured by amendment.

### 3.      Claim Against BNY is Dismissed

Lillian's only allegation against BNY pertains to the withdrawal of funds from Lillian's trust account in the amount of $1,528,271.44:

> UBS withdrew funds from Lillian Pellegrini's trust account, issued check number 0001023561 for $1,528,271.44 on Bank of NY Mellon account number 043301601 made payable to the Unapproved Payee, Fresno County Public Guardian for the Lillian Pellegrini Family Trust (a trust that was known by UBS Financial Services, Weintraub Tobin, Fresno County Counsel, the Fresno County Public Guardian, and Fresno Superior Court not to exist at the time of transfer and was not created at any time, before or after the transfer).   Bank of NY Mellon . . . were contacted immediately and informed of the fraudulent transfer and to stop payment and return the check to UBS Financial Services. Bank of NY Mellon did not comply.

(Cmplt., 38:10-23.)   This claim stems from an allegation that Lillian's UBS account funds were improperly withdrawn.   This issue, however, was already decided by FCSC; UBS was complying with an order executing FCSC's judgment as to the trust assets.   As discussed above, Lillian cannot re-litigate any issue pertaining to the existence of the Family Trust, the amount FCSC ordered it be funded, or FCSC's order that UBS make payment to Public Guardian.   The claim against BNY is barred by issue preclusion.   The predicate facts and issues of law on which this claim rests – the existence and funding of the Family Trust – were already decided against Lillian.   This claim cannot be saved by amendment, and it is dismissed without leave to amend.

1

**D.**     **Fresno County's Motion to Dismiss is GRANTED**

2

Fresno County[21] seeks dismissal of Lillian's complaint under Rule 12(b)(6).  Fresno County

3

asserts Lillian's conversion allegations against it cite criminal statutes for which there is no private right

4

of action.  Moreover, Fresno County contends the claims against it are barred by immunity and the

5

prosecutorial privilege.

6

Lillian asserts Fresno County perpetrated a fraud that a Family Trust had been created under the

7

1999 Trust document and cites 18 U.S.C. §§ 1621-1623.  Lillian claims the statements made by Fresno

8

County, through the County Counsel, in its ex parte petition filed with the FCSC on October 19, 2016,

9

were false.  (Cmplt., 39:21-40:18.)  Lillian also maintains Fresno County acquired funds from her UBS

10

account by way of fraud and deliberate misrepresentation of the facts and the law.  (Cmplt., 41:21-27.)

11

These allegations stem from Lillian's primary contention that the Family Trust never existed:

12

13

14

15

> The property actually stolen by Fresno County from Lillian Pellegrini's revocable trust
> came from two trusts of which Lillian Pellegrini owns all property.  Income generated
> from investments in the irrevocable trust, of which Lillian Pellegrini is sole Trustee and
> sole Beneficiary and has full power of appointment that she has exercised, flows into the
> revocable trust of which also was the inherited separate property of Lillian Pellegrini
> that she holds as Sole Settlor, Trustee, and Sole Beneficiary.

16

(Cmplt., 41:15-20.)  The issue of whether the Family Trust existed and whether it should have been

17

funded with Lillian's trust assets was decided by FCSC.  Any conversion claim against Fresno County

18

predicated on Lillian's allegation that funds were wrongfully withdrawn from her account pursuant to

19

court order is barred by issue preclusion.  Additionally, the statutes Lillian cites in reference to a

20

"conversion" claim, including 18 U.S.C. §§ 1621 (perjury), 1622 (subornation of perjury), 1623 (false

21

declarations before grand jury or court), are criminal statutes for which there is no private right of

22

action.

23

24

25

---

[21] Fresno County was erroneously sued as "Fresno County Counsel representing Joshua Cochron" and the "Fresno County Public Guardian."

1    Lillian also alleges Fresno County Counsel, as representative for the Public Guardian, took

2    Lillian's UBS assets by falsifying documents and court rulings in preparing ex part petitions and orders.

3    These allegations, too, hinge on the premise that "Fresno County Counsel knew that no Family Trust

4    had been created."  (Doc. 1, Cmplt., 40:4.)  As discussed above, Lillian cannot re-litigate the issue of

5    whether a Family Trust was created – that issue was expressly decided by the FCSC.  Her claim of

6    fraud, conversion, and due process violations cannot rest on allegations regarding issue that were

7    already decided against Lillian in the underlying matter.[22]

8    Moreover, in their role as advocates for the Public Guardian and as the Public Guardian in the

9    probate proceedings, Fresno County Counsel and Joshua Cochron are entitled to prosecutorial

10   immunity.  The California Government Code section 821.6 provides that "[a] public employee is not

11   liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding

12   within the scope of his employment, even if he acts maliciously and without probable cause."

13   "California courts construe this provision broadly 'in furtherance of its purpose to protect public

14   employees in the performance of their prosecutorial duties from the threat of harassment through civil

15   suits."  *Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1108-09 (N.D. Cal. 2011) (quoting *Gillan v.*

16   *City of San Marino*, 147 Cal. App. 4th 1033, 1048 (2007)).  "Immunity under Government Code

17   section 821.6 is not limited to claims for malicious prosecution, but also extends to other causes of

18   action arising from conduct protected under the statute, including defamation and intentional infliction

19   of emotional distress."  *Gillan*, 147 Cal. App. 4th at 1048.  It also applies to all employees of a public

20   entity, not just its legally trained personnel.  *Asgari v. City of L.A.*, 15 Cal. 4th 744, 756-57 (1997).

21   For example, in *Pagtakhan v. Alexander*, 999 F. Supp. 2d 1151, 1160 (N.D. Cal. 2013), the

22   district court applied section 821.6 to claims against employees of the Public Guardian's office based on

23   the prosecution of a conservatorship proceeding.  Here, like *Pagtakhan*, the Public Guardian, as

24

25   [22] As it relates to allegations that Fresno County colluded with UBS and Weintraub Tobin to perpetrate a fraud on the FCSC (Cmplt., pp. 39-41), that issue is addressed below in considering Weintraub Tobin's motion to dismiss.

35

1   successor trustee, was obligated to pursue FCSC's order that Lillian fund the Family Trust.  Lillian's

2   allegations regarding the County Counsel's preparation of ex parte petitions and orders and obtaining

3   injunctions related to this funding of the Family Trust all stem from the County Counsel's

4   representation of the County and the Public Guardian in the underlying case, and the County Counsel

5   and the Public Guardian are immune from suit under section 821.6

6       Finally, to the extent Lillian claims County Counsel or the Public Guardian made

7   misrepresentations to the FCSC during the course of the underlying proceedings, they are part of

8   Fresno County, a public entity, and are immune for any injury caused by misrepresentation.  Cal. Gov't

9   Code § 818.8.

10      In sum, the Court finds Lillian's allegations against Fresno County based on assertions the

11  Family Trust never existed or that Fresno County had no legitimate power to withdraw funds from

12  Lillian's UBS account, are barred by the doctrine of issue preclusion.  Moreover, as it pertains to

13  actions Fresno County and the Public Guardian took in carrying out FCSC's orders, Fresno County –

14  and its employees – is entitled to immunity.  Fresno County's motion to dismiss is GRANTED.

15  **E.       Weintraub Tobin's Motion to Dismiss is GRANTED**

16      In its motion to dismiss, Weintraub Tobin argues Lillian's allegations of fraud against it are

17  insufficient to state a cognizable claim as a matter of law.  (Doc. 45.)  Beyond this, Weintraub Tobin

18  asserts the allegedly fraudulent conduct is outside the applicable statute of limitations.

19      Lillian asserts Weintraub Tobin, as counsel for Marleen Merchant, knowingly and falsely

20  claimed to FCSC that a Family Trust was created and that Lillian had breached her fiduciary duties by

21  failing to fund the Family Trust.  (Cmplt., 18:26-29:2.)  Lillian also contends Weintraub committed

22  fraud by claiming that all property held in the 1999 Trust was community property, which Weintraub

23  Tobin knew to be false.  (Cmplt., 18:2-5.)  Lillian asserts this became clear when Weintraub Tobin filed

24  a document in June 2016 with the Fifth DCA stating that the Family Trust was "supposed" to have been

25  created, implying that it never actually had been created.  (Cmplt., 18:6-8.)  Lillian terms this "fraud on

1     the court."

2          Weintraub Tobin argues there is no private cause of action for "fraud on the court," and any

3     such claim is barred by res judicata because the only remedy for such a claim is to set aside the FCSC's

4     findings in the underlying case.

5          A claim for "fraud on the court" arose from the common law as a court-created equitable device

6     to remedy injustices under the court's inherent power.  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,

7     322 U.S. 238, 248 (1944).  Federal Rule of Civil Procedure 60 expressly provides a remedy for such

8     fraud, stating that "the court may relieve a party or its legal representative from a final judgment, order,

9     or proceeding . . . [for] fraud (whether previously called intrinsic or extrinsic), misrepresentation, or

10    misconduct by an opposing part . . . . "  Fed. R. Civ. P. 60(b)(3).  Rule 60 does "not limit a court's power

11    to  . . . set aside a judgment for fraud on the court."  Fed. R. Civ. P. 60(d)(3).  Due to its equitable

12    origins, however, no court has ever recognized fraud on the court as an independent legal cause of

13    action for which a plaintiff may recover damages.  It is, instead, a theory pursuant to which a party may

14    seek relief from a judgment or court order induced on the basis of the opposing party's fraud.  *Hazel-*

15    *Atlas Glass Co.*, 322 U.S. at 248.)

16          To the extent Lillian's "fraud on the court" claim seeks damages, it is not viable because the

17    only available remedy is equitable.  To the extent Lillian's claim of fraud on the court seeks to set aside

18    the FCSC judgment, the claim is barred by res judicata.  Federal courts "will not entertain a collateral

19    attack on a state judgment on the basis of 'fraud on the court' in an action for damages."  *LaMie v.*

20    *Wright*, No. 1:12-cv-1299, 2014 WL 1686145, at *14 (W.D. Mich. Apr. 29, 2014); *see also Fox*

21    *Hollow of Turlock Owner's Ass'n v. Mauctrst, LLC.*, No. 1:03-cv-5439-AWI-SAB, 2015 WL 5022762,

22    at * 4 (E.D. Cal. Aug. 24, 2015).   "The universal rule in the federal courts . . . is that an equitable

23    action to set aside a judgment may only be heard by the court whose judgment is challenged." (citing

24    *Weisman v. Charles E. Smith Mgmt., Inc.*, 829 F.2d 511, 514 (4th Cir.1987); *Sessley v. Wells Fargo*

25    *Bank, N.A.*, No. 2:11–cv–348, 2012 WL 726749, at * 9 (S.D. Ohio Mar. 6, 2012) (if plaintiff believed

37

that a state court foreclosure judgment was obtained by fraud on the state court, plaintiff's remedy was

by way of motion for relief filed in the state court, not by way of a collateral attack in federal court)).  If

she believes the FCSC judgment was procured by fraud on the court, Lillian's remedy is (or was) to

bring a post-judgment motion or an independent action in equity to vacate the judgment in that court.

A collateral attack on that state court judgment cannot be made in federal court.[23]

For this reason, Lillian's allegation of fraud against Weintraub Tobin is not viable as a claim for

relief and cannot be cured by amendment.  As such, leave to amend is inappropriate.[24]

**F.   Comerica's Motion to Dismiss is GRANTED**

Comerica contends Lillian makes no allegation that gives rise to a cognizable claim against it,

and Comerica owes no duty of care to Lillian as an unrelated third party.  Comerica requests the claim

against it be dismissed without leave to amend.  (Doc. 46-1.)

Lillian alleges that UBS withdrew funds from her trust account in the amount of $1,528,271.44

on BNY account number 043301601.   BNY CEO Gerald Hassell and  General  Counsel  Anthony

Mancuso were "contacted immediately and informed of the fraudulent transfer and to stop payment and

return the check to UBS Financial Services.  Bank of NY Mellon did not comply."  (Cmplt., 38:10-23.)

Lillian's daughter, Beverly, was informed by the CPA and Controller for Fresno County that the Public

Guardian uses Comerica Inc. to deposit funds that the Public Guardian receives.  (Cmplt., 38:24-26.)

Lillian claims Comerica was contacted immediately to return the check unpaid to UBS "on receipt and

before it cleared."  (Cmplt., 39:2-12.)   Lillian does not state whether she was able to confirm that

Comerica was the depository bank.

No formal cause of action is stated, and the allegation that Comerica was asked to stop payment,

but did not return the funds to UBS does not form the basis of a claim upon which relief can be granted.

---

[23] This applies equally to Lillian's claims that UBS and Fresno County colluded with Weintraub Tobin to commit a fraud on the court.  (Cmplt., pp. 49-41.)

[24] Because the claim is otherwise not viable, the Court does not reach Weintraub Tobin's statute of limitations argument.

Even to the extent Comerica received a deposit from UBS made payable to the Public Guardian, Comerica would have been acting in accord with FCSC's order that funds from Lillian's UBS account be withdrawn and paid to the Public Guardian.  Lillian has not alleged any facts showing how Comerica has any duty to her.  The allegations against Comerica merely show that Comerica may have been the depository bank for the trust funds ordered to be paid to the Public Guardian.  There is no cognizable claim stated against Comerica and any amendment will be futile.  As such, Lillian's claim against Comerica is dismissed with prejudice.

## VII. <u>CONCLUSION AND ORDER</u>

For the reasons stated above, IT IS HEREBY ORDERED that:

1.      Defendants' motions to dismiss are GRANTED;

2.      Beverly Pellegrini's Request for Intervention is DENIED;

3.      Lillian Pellegrini's complaint is DISMISSED with prejudice and without leave to amend; and

4.      The Clerk of Court is DIRECTED to enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

Dated:   **April 6, 2017**                          **/s/ Lawrence J. O'Neill**
                                                             UNITED STATES CHIEF DISTRICT JUDGE